**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4144-23

IN THE MATTER OF HUDSON
COUNTY MEDICAL/FISCAL
ADMINISTRATION AT THE
HUDSON COUNTY
CORRECTIONAL CENTER.

_____

Argued September 16, 2025 – Decided December 1, 2025

Before Judges Rose, DeAlmeida and Torregrossa-O'Connor.

On appeal from the New Jersey Office of the State Comptroller.

Cindy Nan Vogelman argued the cause for appellant County of Hudson (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; Cindy Nan Vogelman, on the briefs).

Jennifer A. Hradil argued the cause for respondent New Jersey Office of the State Comptroller (Gibbons, PC, attorneys; Peter J. Torcicollo, Jennifer A. Hradil, Kevin W. Weber, Ryan P. Goodwin and Julia E. Browning, on the brief).

PER CURIAM

The County of Hudson (County) appeals from the August 5, 2024 final agency decision of the Office of the State Comptroller (OSC) finding the County failed to comply with the notice and public bidding requirements established in the Local Public Contracts Law (LPCL), N.J.S.A. 40A:11-1 to -60, when it awarded a contract to provide medical care, mental health care, and related fiscal management at the Hudson County Correctional Center (HCCC) for the period April 1, 2024, to March 31, 2025, and directing the County to comply with the LPCL when it takes any action to renew or award the contract for any period beginning April 1, 2025, or thereafter. We affirm.

I.

This matter concerns the statutory authority of the State Comptroller with respect to the procurement of contracts by local public entities. A review of the relevant statutory provisions is necessary to place the facts in context.

The State Comptroller is authorized to "monitor the process of soliciting proposals for, and the process of awarding, contracts made by . . . units of local government . . . that involve a significant . . . expenditure of funds." N.J.S.A. 52:15C-7(b). To facilitate this authority,

> [a] contracting unit shall inform the State Comptroller in writing . . . of the commencement of any procurement process involving consideration or an expenditure of [$12,500,000] or more at the earliest time practicable

as the contracting unit commences the procurement process but no later than the time the contracting unit commences preparation of: any bid specification or request for proposal.

[N.J.S.A. 52:15C-10(b)(1).][1]

Notification triggers a thirty-day pause in the procurement process. N.J.S.A. 52:15C-10(b)(2) provides:

Unless waived by the State Comptroller upon request of the contracting unit, at least [thirty] days shall elapse from the time the contracting unit informs the State Comptroller pursuant to paragraph (1) of this subsection and the time the contracting unit may issue any public advertising, notice of availability of a request for proposals or any other public or private solicitation of a contract for a procurement that is subject to this subsection in order that the State Comptroller may complete a review that may be undertaken pursuant to [N.J.S.A. 52:15C-10(b)(4)].

Once a contracting unit provides information and documents concerning the proposed procurement, "the State Comptroller may review such submission and provide a written determination to the contracting unit regarding whether

---

[1] Although N.J.S.A. 52:15C-10(b)(1) sets a threshold of $10,000,000 for notification, N.J.S.A. 52:15C-10(d) directs the State Comptroller, after consultation with the Department of the Treasury, to periodically adjust the notification threshold pursuant to specified criteria. The State Comptroller adjusted the notification threshold under N.J.S.A. 52:15C-10(b)(1) to $12,500,000, effective July 1, 2020. 52 N.J.R. 1443 (b).

the procurement process complies with applicable public contracting laws, rules, and regulations." N.J.S.A. 52:15C-10(b)(4).

> If the State Comptroller determines that the procurement process does not comply with applicable public contracting laws, rules, and regulations, the State Comptroller shall direct the contracting unit not to proceed with the procurement. In such an instance, the State Comptroller shall state the reasons for such determination and may include in its determination guidance to the contracting unit regarding an appropriate procurement process.
>
> [Ibid.]

The State Comptroller may also "propose and enforce remediation plans" for local government units "that are found by the State Comptroller to have deficient practices or procedures." N.J.S.A. 52:15C-8(a).

"A contracting unit may proceed with a planned procurement . . . after the expiration of the [thirty]-day period or the granting of a wavier" by the State Comptroller "unless it receives a written determination not to proceed from the State Comptroller within [fifteen] business days of the date the contracting unit provided written notice to the State Comptroller." N.J.S.A. 52:15C-10(b)(4).

A.    The 2018 HCCC Medical Services Contract.

The County is a local government unit whose contract procurement practices are subject to the State Comptroller's review. N.J.S.A. 52:15C-10(a).

4

On May 1, 2018, the County sent contract specifications to ten preselected vendors soliciting proposals to provide medical care, mental health care, and related fiscal management at the HCCC. The specifications indicated the County sought not only the professional services of physicians, other medical personnel, and unlicensed staff, but also related fiscal and administrative services to operate all aspects of a health care facility within the HCCC. The County did not publicly advertise it was issuing the contract specifications or provide a means by which potential bidders, other than the ten preselected vendors, could obtain a copy of the specifications.

On May 14, 2018, the County wrote to the State Comptroller informing him for the first time it had solicited contract proposals from ten preselected vendors and would not engage in competitive bidding for the HCCC services. According to the County, neither public bidding nor competitive contracting was necessary because the services sought in the contract were professional in nature pursuant to N.J.S.A. 40A:11-5 and :11-2(6). The County stated it expected the contract value to exceed $10 million, and it intended to select a vendor and subsequently negotiate a contract with the vendor.[2] The County expected responses from the preselected vendors by June 11, 2018.

---

[2] At the time, the statutory notification threshold was $10,000,000.

The County wrote to the State Comptroller again on May 24, 2018, stating an emergent need existed to replace the then-existing contract for health care services at the HCCC. The County requested the State Comptroller waive his review of the contract specifications pursuant to N.J.S.A. 52:15C-10(b). Alternatively, the County offered to postpone the June 11, 2018 contract proposal due date.

On May 31, 2018, the OSC replied in writing, noting the County's failure to comply with the notification provisions of N.J.S.A. 52:15C-10(b)(1), and acknowledging the urgent nature of the procurement due to recent inmate and detainee deaths at the HCCC. The letter stated because of those circumstances, the State Comptroller would not review the procurement process and would instead conduct a post-award contract review. Although the State Comptroller did not stop the procurement process, the letter noted the County's characterization of the contract as being one for professional services may conflict with N.J.S.A. 40A:11-15, which requires contracts for professional services not exceed twelve months.

In a July 30, 2018 letter, the County advised the State Comptroller that on July 12, 2018, the Hudson County Board of Chosen Freeholders[3] approved a resolution awarding a one-year contract to Correct Care Solutions (CCS) for the term July 16, 2018, through July 17, 2019, at a cost of $7,675,073.60, with extensions for two additional one-year periods at prices established through the procurement.[4] The County included with its correspondence documentation for the State Comptroller's post-award review. The County requested the State Comptroller issue an advisory opinion as to: (1) whether the County's contract with CCS was one for professional services; and (2) whether the duration of the contract was permissible. The County stated, "in the event a consensus could not be reached on these issues," it would file a declaratory judgment action.

On October 15, 2018, the OSC issued a letter neither approving nor disapproving the County's contract with CCS. The letter, however, explained in detail how the procurement process did not comply with the LPCL, provided guidance for similar future procurements, and conveyed an offer to work

---

[3] Effective January 1, 2021, the State's County Boards of Chosen Freeholders were renamed Boards of County Commissioners. L. 2020, c. 67.

[4] Although the CCS contract was intended to begin on July 16, 2018, a transition period from the prior vendor delayed the starting date of the contract to October 1, 2018. The initial one-year term ended on September 30, 2019.

cooperatively with the County to structure future procurements in a manner consistent with the LPCL, as contemplated by N.J.S.A. 52:15C-10(b).

Specifically, the letter stated designating the contract as one for professional services, yet bidding it with an extension of more than one year, was inconsistent with N.J.S.A. 40A:11-15. In addition, the letter explained, given the nature of the CCS contract, the County should have either: (1) publicly bid and awarded the contract to the lowest responsible bidder under N.J.S.A. 40A:11-4 for a term of up to three years under N.J.S.A. 40A:11-15(29); or (2) issued a request for proposals under N.J.S.A. 40A:11-4.1, -4.1(h), and -4.2, and awarded a contract for up to five years through competitive contracting.

The County thereafter filed a complaint in the Chancery Division seeking a declaratory judgment under the Declaratory Judgment Act, N.J.S.A. 2A:16-50 to -62 and Rule 4:42-3, confirming the CCS contract was a professional services contract that may be awarded without public bidding for a term of up to three years. The Chancery Division transferred the matter to this court under our exclusive jurisdiction to review final agency decisions. See R. 2:2-3(a)(2).

We dismissed the appeal as non-justiciable. Cnty. of Hudson v. State of N.J. Off. of the State Comptroller, No. A-3088-18 (App. Div. Dec. 30, 2020)

(slip op at 13). Noting the contract had twice been renewed before the appeal was argued, we held:

> The [C]ounty cannot allege any harm arising from the State Comptroller's . . . letter. The State Comptroller did not prevent the [C]ounty from awarding the contract to CCS, or twice renewing the agreement for one-year terms. The State Comptroller's opinion that the procurement process for the CCS contract violated the [LPCL] has had no effect on the validity of the agreement. No party has sought to vitiate the contract. The [C]ounty is in no different position than it would have been had the State Comptroller either found that the procurement process complied with the law or had not acted at all.
>
> [Id. at 11.]

For several reasons, we found unpersuasive the County's argument a decision with respect to whether the procurement process complied with the LPCL would provide legal clarity for its anticipated procurement of a new contract for medical services at the HCCC after the CCS agreement expired in September 2021. As we explained:

> First, a decision concerning the validity of the procurement process for the CCS contract will not obviate the [C]ounty's obligation to comply with the notice provisions of N.J.S.A. 52:15C-10(b) when it contemplates procuring a new agreement. Nor will a decision with respect to the procurement process for the CCS contract necessarily apply to the procurement process for a new contract, which will have its own specifications. It is the details of the specification[s]

9

for the new contract that will be reviewed by the State Comptroller to determine compliance with the [LPCL], not the provisions of the CCS contract.

Second, and more importantly, the Legislature has established a statutory procedure for the [C]ounty to obtain the State Comptroller's review, approval, and guidance on procuring its contracts of significant cost. Uncertainty with respect to the CCS contract, if such uncertainty exists, is the result of the [C]ounty's failure to fulfill its statutory obligation to provide timely notice of its intended procurement to the State Comptroller. There is no doubt that the [C]ounty is now aware that it is required to provide the State Comptroller notice "at the earliest time practicable," N.J.S.A. 52:15C-10(b)(1), of its intention to procure a new contract after expiration of the CCS agreement. We must respect the legislative preference to have the [C]ounty's procurement process for a new agreement reviewed in the first instance by the State Comptroller. The statute contemplates a cooperative effort between the local government entity and the State Comptroller to ensure compliance with the [LPCL]. In the event that those efforts do not result in the State Comptroller's approval of the [C]ounty's intended procurement process for a new contract, the [C]ounty may at that time seek judicial relief.

[Id. at 12-13.]

B.      The 2023 HCCC Medical Services Contract.

In July and August 2023, the County sent specifications for the HCCC medical services contract for the period beginning October 1, 2023, to several self-selected vendors. The specifications advised the County intended to award

the contract as one for professional services pursuant to N.J.S.A. 40A:11-5(1)(a)(i), with no public bidding or competitive contracting for a period of one year with the potential for two, one-year extensions. The County did not publicly advertise the procurement or notify the State Comptroller of the procurement.

The specifications required the contractor provide comprehensive health care management, mental health care management, medication assisted treatment (MAT),[5] and fiscal management at the HCCC. Specifically, the specifications sought "appropriate, timely, cost effective and quality medical, dental, and behavioral services" for inmates and required a "comprehensive network of accessible, high-quality and cost-effective community providers . . . be made available by the provider to meet the healthcare needs of the inmates when their health status cannot be maintained in the onsite medical facilities." The specifications required an array of tasks to provide a continuum of services beginning with inmate intake and including medical screening, sick call, infirmary care, and ambulatory care. The specifications also required the contractor provide Medicaid and health insurance enrollment services under the Affordable Care Act, medical claims auditing, inmate medical claim processing,

---

[5] The MAT program treats inmates with opioid use disorder.

initiating and managing third-party reimbursement, a computerized medical claims system, electronics records management, procuring and overseeing subcontractors, preparing 1099 year end reports, preparing an annual management plan, and preparing daily, weekly, monthly, quarterly, and annual reports regarding the overall management and operation of medical services at HCCC.

The specifications required potential vendors to provide a cost matrix of hourly rates for professional and non-professional staff. The non-professional staff positions included medical assistant, pharmacy technician, dental assistant, administrative coordinator, unit coordinator, medical records administrator, medical records clerk, X-ray technician, and MAT mental health counselor. The specifications required potential vendors to list their fully loaded fixed prices for all services to be provided under the contract, including direct and indirect costs, labor costs, overhead, fee or profit, clerical support, equipment, materials, supplies, administrative support, documents, reports, forms, travel reproduction, and any other costs.

The County discussed the specifications with its selected potential vendors and, on September 22, 2023, received six proposals. The County did not conduct a public opening of the proposals, all six of which exceeded the

statutory notification threshold. An evaluation committee selected the incumbent vendor, Wellpath, LLC (Wellpath), a corporate successor to CCS. None of the evaluation committee members signed a certification stating they did not have a conflict of interest with the potential vendors who submitted proposals. The County and Wellpath privately negotiated contract terms without public notice.

On November 17, 2023, the County notified the State Comptroller for the first time it intended to award a professional services contract for medical services at the HCCC, without public bidding or competitive contracting, to Wellpath for $13,488,000 for a one-year period commencing on December 20, 2023.[6] The specifications included the option of two, one-year renewals, resulting in a potential contract value of about $40.5 million over three years.

On November 30, 2023, the OSC advised the County the procurement was "not approved to move forward while [the Comptroller] is reviewing the submission and additional information provided by [the] County."

---

[6] The HCCC medical services contracts for the periods October 1, 2021, to December 19, 2023, are not before this court. According to the OSC, the County awarded approximately $39,500,000 towards HCCC medical services from 2018 to October 2023, but no individual award exceeded the statutory procurement notification threshold. Those contracts were with CCS or Wellpath. The change in the starting date for the 2023 contract from October 1, 2023, to December 20, 2023, is not material to our analysis of parties' arguments.

13

On December 12, 2023, the OSC issued an eleven-page written determination concluding the County had improperly relied on the professional services exception to the public bidding requirement and, therefore, failed to comply with the LPCL with respect to issuance of the 2023 HCCC medical services contract. The OSC found the County again failed to comply with the notice provisions of N.J.S.A. 52:15C-10. It noted our observation relating to the 2018 contract that "[t]here is no doubt that the [C]ounty is now aware that it is required to provide the State Comptroller notice 'at the earliest time practicable,' N.J.S.A. 52:15C-10(b)(1), of its intention to procure a new contract after expiration of the CCS agreement." Cnty. of Hudson, slip op. at 12-13. Yet, the OSC concluded, the County notified it of the procurement for the 2023 contract even later in the process than it did with respect to the 2018 procurement. The OSC characterized the County's failure to comply with the notice provisions as "demonstrat[ing] disregard for both the statutory scheme created by the Legislature and [this court's] decision regarding the 2018 [p]rocurement."[7]

---

[7] The OSC noted that on November 3, 2023, the County provided timely notification before advertising a notice to bidders and solicitation for food services at the HCCC, demonstrating its awareness of and ability to comply with the statutory notification requirements.

On the substantive question, the OSC concluded "[t]he County's reliance on the professional services exception to award this contract without public bidding is a departure from both the plain text of N.J.S.A. 40A:11-5 and judicial interpretations of LPCL." The OSC found N.J.S.A. 40A:11-4 requires public bidding and an award to the lowest responsible bidder for all local government contracts for goods and services over the bid threshold, unless a statutory exemption applies. The OSC determined the 2023 HCCC medical services contract did not qualify for an exemption from public bidding as a procurement of professional service under N.J.S.A. 40A:11-5(a)(i).

The OSC noted the definition of professional services under N.J.S.A. 40A:11-2(6) provides such services must be "rendered or performed by a person authorized by law to practice a recognized profession" and not by "a management firm contracted to perform a bundle of services, only some of which will be performed by persons whose credentials meet the definition" of professional services. It noted the HCCC medical services contract contemplated services to be provided by numerous non-professionals who do not meet the narrow statutory definition in N.J.S.A. 40A:11-2(6). In addition, the OSC found the contract's "pricing structure is in line with a contract for

15

operations and management, as opposed to contracts for professional services, which are typically invoiced at an hourly rate for work performed."

The OSC also noted the contract specifications required pricing for electronic medical records (EMR) software, which was obtained by the County through competitive contracting in 2018 for use at HCCC. It found prior use of competitive contracting to award the EMR software procurement was an acknowledgment by the County those services cannot be awarded without public bidding as a professional service. The OSC found combining the EMR software services with inmate patient care services in a single contract does not transform the software services into professional services.

The OSC also found, even if the 2023 HCCC medical services contract qualified as a professional services contract, its term must be limited to one year. Relying on N.J.S.A. 40A:11-15 and -3(b), the OSC determined contracts for professional services issued without public bidding shall not exceed twelve consecutive months and may not be extended thereafter. Thus, the OSC concluded, even under the County's characterization of the nature of the 2023 HCCC medical services contract, the renewal options were invalid.

The OSC directed the County not to proceed with the procurement of the 2023 HCCC medical services contract without public bidding or competitive contracting. It directed

> [t]he procurement of a management firm to provide a turn-key solution for health care management, mental health care management, fiscal management, and other administrative services at the [HCCC] must be procured by either: (1) the issuance of a publicly advertised bid awarded to the lowest responsible bidder pursuant to N.J.S.A. 40A:11-4, for a term of up to three years, as permitted by N.J.S.A. 40A:11-15(29); or (2) the issuance of a publicly advertised competitive contracting request for proposals awarded to the firm whose proposal is most advantageous to the County, price and other factors considered, pursuant to N.J.S.A. 40A:11-4.1 [to -]4.5, for a term of up to five years, as permitted by N.J.S.A. 40A:11-4.2.

The OSC acknowledged the existing medical services contract for the HCCC was set to expire in eleven days and the provision of medical services to HCCC inmates was essential to their health and safety. In what it described as "a cooperative effort to ensure compliance with the LPCL in procuring these services," the OSC directed the County to provide "a plan for corrective action to extend Wellpath's current contract for so long as necessary to procure the services in a compliant manner" by December 21, 2023.

The parties thereafter exchanged several letters regarding the procurement. In addition, the County produced additional documents and

17

information, including an analysis by an outside medical consultant, and produced County representatives for interviews by the OSC. The County, however, did not submit a corrective action plan, despite several directives to do so.

On March 21, 2024, the OSC issued a written decision reiterating its conclusion the County failed to comply with the notification provisions of N.J.S.A. 52:15C-10, improperly conducted the procurement by relying on the professional services exception to public bidding, impermissibly sought to award a professional services contract that may be extended for up to three years, and employed an approach to procuring inmate medical care services that resulted in less transparency and less competition than the LPCL requires.

With respect to the County's failure to comply with the notification requirement, the OSC acknowledged the County Counsel's claim the prior HCCC medical services contract was for $11 million and it was his good faith business judgment the 2023 contract would fall below the $12.5 million notification threshold. In addition, OSC acknowledged the County's claim approximately $1.7 million of the costs of the 2023 proposals was unexpected due to the County's failure to account for increased costs resulting from attrition

of County-employed nurses at HCCC who retired or terminated employment between 2018 and 2023.

The OSC found, however, the County knew as of September 22, 2023, when it opened the proposals, the lowest proposal exceeded the $12.5 million notification threshold. The County waited until November 17, 2023 to provide notice to OSC it intended to award the contract to Wellpath in an amount almost $1 million greater than the notification threshold. The OSC also rejected the County's claim it did not promptly provide notification because County Counsel was optimistic he could negotiate a contract price below $12.5 million.

With respect to the County's claim the contract was exempt from public bidding or competitive contracting, the OSC reaffirmed the analysis and conclusion set forth in its December 12, 2023 letter. The OSC rejected the undated and unsigned written opinion of the County's outside medical consultant, who determined only five percent of the cost of the Wellpath proposal concerned non-professional services.

The OSC found the County's refusal to provide a corrective action plan after three directives resulted in the self-created emergency the County was attempting to use as a reason to circumvent the statutory requirements intended to ensure the integrity of the procurement process and protect taxpayers. The

OSC, pursuant to N.J.S.A. 52:15C-11(b), reported the "County's ongoing violations of law and failure to cooperate to the Governor, the President of the Senate, and the Speaker of the General Assembly." The OSC reiterated its prior directive the County not proceed with the contract award and submit a corrective action plan to address its non-compliance with the LPCL and the timeline for re-procurement of the contract within five days.

Without prior notice to the State Comptroller, the County awarded the contract to Wellpath on March 28, 2024, in the amount of $13,488,000 for a one-year term to commence three days later. Also on March 28, the County notified the State Comptroller the contract had been executed. The County failed to submit the required contract compliance form or associated contract documents, including the contract itself, for more than forty-five days.

On June 28, 2024, the County notified the State Comptroller that, prior to the March 31, 2025 expiration of the then-current contract, the County intended to re-procure the contract as "either a one[-]year professional services contract to Wellpath or to employ an informal process similar to that undertaken by the County this past year." The County recognized it was proceeding despite the OSC's "disagreement as to whether the medical services contract may be legally awarded in the matter previously utilized."

On August 24, 2024, the OSC issued a final decision and remediation plan incorporating the analysis and conclusions in its March 21, 2024 determination, finding the County failed to comply with the notification provisions of N.J.S.A. 52:15C-10(b) and improperly procured and awarded the 2023 HCCC medical services contract.  The OSC directed that:

> (1)  The County shall not take any actions to renew or award a contract for medical and fiscal management services valued at $12.5 million or greater for the period beginning April 1, 2025[,] in reliance upon the professional services exception to bidding under N.J.S.A. 40A:11-5[(1)](a)(i) or any informal process similar to the process used by the County to award the current [c]ontract; and
>
> (2)   The County shall not advertise or release any solicitation for medical and fiscal management [s]ervices at the HCCC valued at $12.5 million or greater that has not been reviewed and approved by OSC.

This appeal followed.[8]

---

[8]  On August 5, 2024, the OSC filed a verified complaint and sought an order to show cause in the Chancery Division pursuant to Rule 4:67-6 to enforce the August 5, 2024 decision.  See Bacon v N.J. State Dep't of Educ., 443 N.J. Super. 24, 34 (App. Div. 2015) ("Under Rule 4:67-6, an administrative agency . . . can institute a summary proceeding in Superior Court to enforce an agency order.").  After the Chancery Division entered the order to show cause, the County filed a notice of appeal from the August 5, 2024 decision and cross-moved for an evidentiary hearing on the validity of the decision and a stay of its enforcement pending appeal.  The Chancery Division entered two orders collectively granting

On December 17, 2024, we denied the County's motion to stay the August 5, 2024 decision and transfer the appeal to the Chancery Division for an evidentiary hearing.

The County argues the 2023 HCCC medical services contract was properly awarded as a professional services contract without public bidding or competitive contracting on an annual basis pursuant to N.J.S.A. 40A:11-5. In the alternative, the County requests a remand for an evidentiary hearing "for the development of a reviewable administrative record" with respect to whether the contract is one for professional services under N.J.S.A. 40A:11-5.[9]

---

an evidentiary hearing, denying a stay, and denying the motion to enforce. We subsequently granted the OSC's emergent motion for leave to appeal and summarily vacated the Chancery Division orders. We found the court did not have authority conduct an evidentiary hearing on the validity of the OSC's decision, and remanded the matter to consider whether enforcement relief was warranted. On December 18, 2024, the Chancery Division entered an order enforcing the OSC's decision.

[9] In January 2025, the County notified the State Comptroller of its intention to procure a contract for HCCC medical services after expiration of the then-current contract through competitive contracting. On September 3, 2025, the State Comptroller received written notice from the County that on August 14, 2025, the Board of County Commissioners approved the award of a contract to provide medical services at HCCC to CFG Health Systems, LLC.

Our review of final decisions of administrative agencies is limited, with those challenging the decision carrying a substantial burden of persuasion. See In re Stallworth, 208 N.J. 182, 194 (2011). An agency's determination must be sustained "'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). "[I]f substantial evidence supports the agency's decision, 'a court may not substitute its own judgment for the agency's even though the court might have reached a different result.'" In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

We are not bound by an agency's interpretation of legal issues. Russo, 206 N.J. at 27. However, we "defer to an agency's interpretation of . . . a statute . . . within the sphere of the agency's authority, unless the interpretation is 'plainly unreasonable.'" E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022) (quoting In re Election L. Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010)). The enhanced deference "comes from the understanding that a state agency brings experience and

specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise."  Ibid. (quoting Advisory Op. No. 01-2008, 201 N.J. at 262); see Acoli v. N.J. State Parole Bd., 224 N.J. 213, 229 (2016) (noting when an agency is charged with enforcing a statute, "deference is given to the interpretation of statutory language by the agency charged with the expertise and responsibility to administer the scheme").

The Legislature enacted the LPCL to ensure a fair, public, and competitive bidding process for the taxpayer's benefit.  Indeed, "[t]he statutes authorizing competitive bidding accomplish that purpose by promoting competition on an equal footing and guarding against 'favoritism, improvidence, extravagance and corruption.'"  Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307, 313 (1994) (quoting Twp. of Hillside v. Sternin, 25 N.J. 317, 322 (1957)).  The LPCL is understood "to curtail the discretion of local authorities by demanding strict compliance with public bidding guidelines."  L. Pucillo & Sons, Inc. v. Mayor and Council of New Milford, 73 N.J. 349, 356 (1977).

The LPCL requires "certain contracts entered into by [counties] be procured through a public bidding process detailed in the statute."  Borough of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer, 169 N.J. 135, 140 (2001); N.J.S.A. 40A:11-2(1)(a) (applying LPCL to "[a]ny county").  Under the

24

LPCL, unless an exemption applies, "[e]very contract . . . for the provision or performance of any goods or services" exceeding the statutory bid threshold must be awarded to the "lowest responsible bidder" after an advertised public bidding process. N.J.S.A. 40A:11-4(a).[10] The "[l]owest responsible bidder" is the bidder "(a) whose response to a request for bids offers the lowest price and is responsive; and (b) who is responsible." N.J.S.A. 40A:11-2(27).

Effective 2000, the Legislature enacted N.J.S.A. 40A:11-4.1 to -4.5 of the LPCL to loosen the public bidding process by permitting certain contracts to be procured through competitive contracting. The statutes "provide[] public entities with an alternative method to solicit proposals for public projects." Weidner v. Tully Env't, Inc., 372 N.J. Super. 315, 318 (App. Div. 2004). Under competitive contracting, "formal proposals are solicited from vendors; formal proposals are evaluated by the purchasing agent or counsel or administrator; and the governing body awards a contract to a vendor or vendors from among the formal proposals received." N.J.S.A. 40A:11-2(23). The amendments were intended "to provide a flexible method to award bids by the use of a scoring and evaluation process," in a manner that "entitles the contracting body to deference

---

[10]  It is undisputed the 2023 HCCC medical services contract exceeded the statutory threshold for public bidding.

in its evaluation of the needs of the contracting unit." Weidner, 372 N.J. Super. at 326. Regardless of whether a contract is procured by public bidding or competitive contracting, the county must publicly advertise the procurement. See N.J.S.A. 40A:11-4, -23; see also N.J.S.A. 40A:11-4.5.

N.J.S.A. 40A:11-4.1, which created the competitive contracting exception to public bidding, provides in relevant part:

> Notwithstanding the provisions of any law, rule, or regulation to the contrary, competitive contracting may be used by local contracting units in lieu of public bidding for procurement of specialized goods and services the prices of which exceeds the bid threshold, for the following purposes:
>
> . . . .
>
> h. Performance of patient care services by contracted medical staff at county . . . correctional facilities.

The Legislature also created exemptions from public bidding that "generally apply[] to situations in which public bidding would be 'meaningless or impractical.'" Nat'l Waste Recycling, Inc. v. Middlesex Cnty. Improvement Auth., 150 N.J. 209, 223 (1996) (quoting Capasso v. L. Pucillo & Sons, 132 N.J. Super. 542, 550 (Ch. Div.), aff'd, 132 N.J. Super. 473 (App. Div. 1974)). One such exception is established in N.J.S.A. 40A:11-5, which provides in relevant part:

Any contract the amount of which exceeds the bid threshold, may be negotiated and awarded by the governing body without public advertising for bids and bidding therefor and shall be awarded by resolution of the governing body if:

(1) The subject matter thereof consists of:

(a) (i) Professional services.

"Professional services" is defined in relevant part as:

services rendered or performed by a person authorized by law to practice a recognized profession, whose practice is regulated by law, and the performance of which services requires knowledge of an advanced type in a field of learning acquired by a prolonged formal course of specialized instruction and study as distinguished from general academic instruction or apprenticeship and training.

[N.J.S.A. 40A:11-2(6).]

"It was always the law that public bidding was dispensed with where the municipality or other governmental unit was contracting for professional services, whether medical, legal or otherwise." Capasso, 132 N.J. Super. at 550. "Professional services are not to be secured by public bidding because there is something inherent in the process which would nullify or detract from the professional quality of the services being sought." Ibid.

The County argues the State Comptroller erred when he found the 2023 HCCC medical services contract does not fall within the professional services

27

exemption from public bidding. We disagree. The unequivocal language of N.J.S.A. 40A:11-4.1(h), viewed in the context of the overall structure of the LPCL, supports the State Controller's determination the County should have procured the 2023 HCCC medical services contract through either public bidding or competitive contracting.

It is well-settled the primary purpose of "statutory interpretation is to determine and 'effectuate the Legislature's intent.'" State v. Rivastineo, 447 N.J. Super. 526, 529 (App. Div. 2016) (quoting State v. Shelley, 205 N.J. 320, 323 (2011)). We start by considering "the plain 'language of the statute, giving the terms used therein their ordinary and accepted meaning.'" Ibid. (quoting Shelley, 205 N.J. at 323). Where "the Legislature's chosen words lead to one clear and unambiguous result, the interpretive process comes to a close, without the need to consider extrinsic aids." Ibid. (quoting Shelley, 205 N.J. at 323).

We do "not 'rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language.'" Id. at 529-30 (alteration in original) (quoting Marino v. Marino, 200 N.J. 315, 329 (2009)). However, "[a]n enactment that is part of a larger statutory framework should not be read in isolation, but in relation to other constituent parts so that a sensible meaning may be given to the

whole of the legislative scheme." Vitale v. Schering-Plough Corp., 447 N.J. Super. 98, 115 (App. Div. 2016) (quoting Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012)).

The general rule of statutory construction requires that "words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language." N.J.S.A. 1:1-1.

N.J.S.A. 40A:11-4(a) established the standard that "[e]very contract . . . for the provision or performance of any goods or services" exceeding the statutory bid threshold must be awarded to the "lowest responsible bidder" after an advertised public bidding process. N.J.S.A. 40A:11-4.1(h), enacted effective 2000, created an exception to the public bidding requirement for the precise services addressed in the 2023 HCCC medical services contract. That statute provides a county "may" use competitive contracting "in lieu of public bidding" to procure "specialized goods and services" for the "[p]erformance of patient care services by contracted medical staff at county . . . correctional facilities." N.J.S.A. 40A:11-4.1(h).

The purpose of authorizing competitive contracting was to "provide[] public entities with an alternative method to solicit proposals for public projects." Weidner, 372 N.J. Super. at 318. The statutory amendments "provide a flexible method to award bids by the use of a scoring and evaluation process" that "entitles the contracting body to deference in its evaluation of the needs of the contracting unit." Id. at 326.

If, as the County argues, the procurement of a contract for the provision of patient care services at a county correctional facility is entirely exempt from public bidding under N.J.S.A. 40A:11-5, which predated 2000, the enactment of N.J.S.A. 40A:11-4.1(h) to permit a more flexible method of procurement in lieu of public bidding for such contracts, would have been superfluous. In addition, in a separate provision of N.J.S.A. 40A:11-4.1, the Legislature provided competitive contracting can be used "[a]t the option of the governing body of the contracting unit" for "any good or service that is exempt from bidding pursuant to" N.J.S.A. 40A:11-5. N.J.S.A. 40A:11-4.1(i). If, as the County argues, procurement of a contract for the provision of patient care services to inmates at a county correctional facility is exempt from public bidding under N.J.S.A. 40A:11-5, there would have been no reason for the Legislature to specifically identify such services in N.J.S.A. 40A:11-4.1(h).

Under the County's interpretation of N.J.S.A. 40A:11-5, the Legislature would have had no reason to authorize the use of competitive contracting "in lieu of public bidding" for specified services already exempt from public bidding requirements. "We must presume that every word in a statute has meaning and is not mere surplusage." Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 587 (2018) (quoting Cast Art Indus., LLC v. KPMG, LLP, 209 N.J. 208, 221 (2012)); see also Gabin v. Skyline Cabana Club, 54 N.J. 550, 555 (1969) ("We cannot assume that the Legislature used meaningless language" in a statute).

In addition, N.J.S.A. 40A:11-4.1(h) identifies the "[p]erformance of patient care services by contracted medical staff at county . . . correctional facilities" as "specialized goods and services." This unequivocal provision contradicts the County's argument such services are "[p]rofessional services" under N.J.S.A. 40A:11-5. Given that professional services were exempt from public bidding at the time N.J.S.A. 40A:11-4.1(h) was enacted, it would have been incongruent for the Legislature to have identified those same services as specialized services for which competitive contract could be used in lieu of public bidding.

If there is any doubt as to the Legislature's intention, and we have none, the more specific enumeration of patient care services at a county correctional facilities in N.J.S.A. 40A:11-4.1(h) must control over the more general and non-specific definition of professional services in N.J.S.A. 40A:11-2(6). See e.g., Williams v. N.J. State Parole Bd., 255 N.J. 36, 47 (2023) ("Where one section of an act deals with a subject in general terms . . . and another deals with a part of the same subject in a more detailed way . . . , the two always should be harmonized.") (quoting 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 46:5 at 236-37 (7th ed. 2022)); see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) (noting it is a "commonplace of statutory construction that the specific governs the general," which is "particularly true" when the two provisions are part of the "same statutory scheme") (alteration in original) (internal quotation marks omitted).

Given that the definition of professional services was in place when the Legislature enacted N.J.S.A. 40A:11-4.1(h), the more specific identification of patient care services at county correctional facilities as special services for which competitive contracting could be used in lieu of public bidding, must control over the more broadly defined complete exemption from public bidding

32

for professional services in N.J.S.A. 40A:11-5. There is no other interpretation of the two statutes that harmonizes their meaning.[11]

The County does not dispute the 2023 HCCC medical services contract procures patient care services at a county correctional facility. The County was, therefore, required by the LPCL to procure the contract either through public bidding under N.J.S.A. 40A:11-4(a), or competitive contracting under N.J.S.A. 40A:11-4.1(h). The County acknowledges it did not procure the contract under either of those statutory methods. We, therefore, affirm the State Comptroller's determination the County failed to comply with the LPCL when it procured the 2023 HCCC medical services contract. We also affirm the State Comptroller's directive the County comply with the LPCL when it procures contracts for patient care at the HCCC in the future.

The County does not dispute the State Comptroller's determination it failed to comply with the notification provisions of the LPCL when it procured the 2023 HCCC medical services contract. In light of our resolution of the

---

[11] In light of this conclusion, we need not decide whether professional services were the predominate services provided by the 2023 HCCC contract so as to qualify as exempt from public bidding under N.J.S.A. 40A:11-5. See Autotote, Ltd. v. N.J. Sport & Exposition Auth., 85 N.J. 363, 372 (1981); Natchtigall v. N.J. Tpk. Auth., 302 N.J. Super. 123, 137 (App. Div. 1997). Nor do we have occasion to address the County's argument a remand is necessary for an evidentiary hearing for that purpose.

parties' conflicting interpretation of the LPCL as it applies to patient care services contracts for the HCCC, we trust the County will comply with its notification and cooperation obligations as defined by the LPCL when procuring such contracts in the future.

To the extent we have not specifically addressed any of the County's remaining contentions, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-4144-23